FRANK STEIN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Stein v. Commissioner
Docket No. 4688-76.
United States Tax Court
T.C. Memo 1977-241; 1977 Tax Ct. Memo LEXIS 199; 36 T.C.M. (CCH) 992; T.C.M. (RIA) 770241; July 27, 1977, Filed Frank Stein, pro se. Paul J. Sude, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: Respondent determined a deficiency of $578.80 in petitioner's *200 Federal income tax for the year 1972. At issue is whether the petitioner is entitled to a long-term capital loss of $3,025.56 in 1972 resulting from a sale by him to a personal friend of 172 shares of common stock of American Export Industries, Inc. FINDINGS OF FACT Some of the facts are stipulated. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioner is a single man whose legal residence when he filed his petition herein was Ardmore, Pennsylvania. For the calendar year 1972 petitioner filed a Federal income tax return with the Philadelphia Service Center, Philadelphia, Pennsylvania. Petitioner is a former Internal Revenue Agent who is engaged in the business of tax consulting. He also manages a portfolio of publicly traded stocks and bonds and trades in such securities for his own account. On or about October 23, 1967, petitioner acquired $4,000 worth of National Equipment Rental, Ltd (NER) 5 1/4 percent convertible debentures at a cost of $4,014.56. These debentures were convertible into common stock of NER at $20 per share. Accordingly, subsequent to the purchase, petitioner converted his NER debentures into 200 *201 shares of NER common stock. On or about August 8, 1969, NER was merged into American Export Industries, Inc. (AEI). Under the terms of the merger the shareholders of NER received.8625 shares of AEI for every share of NER common. Therefore, petitioner owned the 172 shares of AEI common stock pertinent herein as of August 8, 1969. In April 1972, petitioner approached Morris Ostroff, his personal and social friend of some 20 years standing and proposed to him that he purchase petitioner's 172 shares of AEI. Ostroff was not looking for a stock purchase at the time and believed that he was accommodating petitioner. On April 20, 1972, petitioner and Ostroff entered into a transaction pursuant to which Ostroff executed his personal check to petitioner in the amount of $989. In exchange petitioner delivered his 172 shares of AEI common stock to his broker, Hornblower & Weeks-Hemphill, Noyes, Inc., for purposes of guaranteeing his signature. Then he mailed the certificates to the transfer agent with directions to register them in the name of Morris Ostroff. Ostroff does not ordinarily purchase common stock. He prefers to make investments in bonds and utilities. When he does purchase *202 bonds or stock, he is concerned with the rating and investment return (dividend or interest) on the issue. Usually he obtains this investment information from his broker, Hornblower & Weeks-Hemphill, Noyes. In the case of the AEI purchase from petitioner, however, Ostroff did not inquire of his broker or Stein concerning whether AEI was paying a dividend. At the time of the sale, April 20, 1972, petitioner arranged with Ostroff that he, petitioner, would repurchase the AEI stock soon after 30 days had elapsed. On May 23, 1972, pursuant to this arrangement, petitioner and Ostroff entered into another transaction pursuant to which Ostroff transferred his certificates representing the 172 shares of AEI then registered in his name, and petitioner issued his personal check to Ostroff in the amount of $989. Again, petitioner took the certificates to his broker to have the signature guaranteed and sent them to the transfer agent for reregistration in his name. Neither prior to April 1972 nor subsequent to May 1972 did petitioner ever sell stock to Ostroff in a private transaction. Neither prior to April 1972 nor subsequent to May 1972 did Ostroff ever sell stocks or bonds to petitioner *203 in a private transaction. Neither prior to April 1972 nor subsequent to May 1972 had Ostroff ever purchased or sold stock to anyone in a private transaction. On April 20, 1972, the high, low and close trading range of AEI common stock on the New York Stock Exchange was: high, 6 1/8; low, 5 7/8; close, 6. On May 23, 1972, the high, low and close trading range of AEI common stock on the New York Stock Exchange was: high, 5 5/8; low, 5 3/8; close, 5 3/8. During the years 1967 through 1972 the high-low trading range of AEI common stock on the New York Stock Exchange was: Year
High
Low
1967
55
26
1968
70
38
1969
50 1/2
18
1970
21 1/8
7 5/8
1971
14 3/8
4 1/4
1972
9 1/8
2 1/4
The earnings per share of AEI common stock during the years 1967 through 1972 before extraordinary items were as follows: Year
Earnings
1967
($ .55) Deficit
1968
.98
1969
.28
1970
($ 3.71) Deficit
1971
($ 4.69) Deficit
1972
($ 2.35) Deficit
Prior to 1973 AEI had not paid any cash dividends. In February 1967 it paid a dividend of 10 percent in stock. In his statutory notice statement (Form 4089) the respondent said: It is determined *204 that the long term capital loss of $3,025.56 which you claimed on your return from the sale of American Export Industries, Inc. stock is not allowable under Section 165 of the Internal Revenue Code. In the alternative, it is also not allowable pursuant to any other section of the Internal Revenue Code because it has not been established that any loss has been incurred during the taxable year. OPINION The resolution of the issue in controversy in this case depends upon the facts and circumstances involved. Petitioner contended at trial [1] that he is entitled to the claimed long-term capital loss of $3,025.56 on the 172 shares of AEI common stock because he sold the stock to Ostroff in a bona fide transaction and repurchased it from Ostroff 33 days later. To the contrary, respondent argues that since the petitioner and his friend had agreed at the time of the sale that the stock would be repurchased by petitioner after 30 days had expired, no loss is allowable because of the "wash sales" provisions of section 1091(a), [2] Internal Revenue Code of 1954. Alternatively, respondent contends that the loss is not allowable under section *205 165 because it lacked business and economic reality and the transaction was not closed and completed. We agree with the respondent. *206 Section 1091(a) of the Code prohibits the deduction of a loss on the sale of stock if substantially identical stock is acquired within 30 days prior to or 30 days subsequent to the sale. The provisions of section 1091 apply also where the taxpayer enters into a contract or option to acquire substantially identical stock. This limitation on losses applies regardless of whether the taxpayer voluntarily and intentionally sells the stock in order to register a loss for income tax purposes, is forced to sell, or sells in order to prevent a greater loss. If stock which has been sold at a loss is repurchased at any time after 30 days from the date of sale, the loss thereon may be claimed provided the sale itself was bona fide and there was no express or implied agreement to buy back. The record here is clear that petitioner arranged with his friend, Ostroff, that he would reacquire the 172 shares of AEI common stock after 30 days had elapsed from the sale date. Ostroff was not looking for a common stock issue in which to invest prior to the sale to him. In fact, he usually purchases bonds and utility company stocks when he does invest. Petitioner approached Ostroff and offered him *207 the deal. Ostroff obliged his friend and, according to his testimony, considered that he was "accommodating" petitioner. Revenue Agent Michael Latch testified that when he discussed the transaction with petitioner at the time of the audit, the petitioner admitted that when the sale was made he had arranged with Ostroff to repurchase the stock after 30 days had elapsed. Petitioner explained to Latch that by waiting the 30-day period he would be in a "safe harbor" for the nonapplicability of the wash sale provisions of section 1091. Although given ample opportunity by the Court, petitioner declined to take the witness stand to rebut the revenue agent's testimony concerning petitioner's admissions to him. Although petitioner did wait 33 days before reacquiring the 172 shares of AEI stock so as to appear to have satisfied the "acquisition" test of section 1091, he overlooked the fact that his prearrangement at the time of sale was tantamount to the acquisition of an option or contract to acquire the identical stock within the prohibited period. Section 1.1091-1(f), Income Tax Regs. *208 , provides that the entering into a contract or option to acquire the substantially identical stock or securities within the prohibited 61-day period is comprehended within the concept of "acquisition." Therefore, the wash sale rule of section 1091 applies to petitioner since at the time of sale he received in substance an oral option to repurchase substantially identical stock. Metropolitan Commercial Corp. & Subsidiary Co. v. Commissioner,T.C. Memo. 1963-116. In any event, the petitioner has failed to sustain his burden of proving that he had not entered into an option to repurchase the same number of shares of the same stock at the same price when he sold the stock at a loss. See Mellon v. Commissioner,36 B.T.A. 977, 1053 (1937), where the stock was reacquired 37 days after the sale and the loss was denied because of the taxpayer's inability to prove that no contract or option had been entered into within 30 days after the sale. A second, and equally convincing, reason for disallowing the claimed loss is that the transaction was devoid of economic substance and business reality. In applying the Federal tax law there is a hardened and compelling *209 axiom that focuses on the substance and not the form of a transaction in determining tax consequences. Gregory v. Helvering,293 U.S. 465 (1935); Commissioner v. Court Holding Co.,324 U.S. 331 (1945). The record herein strongly suggests that the purported sale to Ostroff of petitioner's 172 AEI common shares, although cast in the form of a sale, was a transaction totally lacking in economic substance. We think the April 20, 1972, transaction was a sham for Federal tax purposes. The inconsistencies here compel the conclusion that the sale and repurchase transaction of the AEI common stock was deficient in business reality. Petitioner had high basis stock ($4,014.56) which was selling on the marketplace for approximately $1,000. It is evident that he wanted to establish a loss for tax purposes yet maintain the posture of his investment position. AEI common stock had literally fallen out of bed since it traded as high as $70 per share in 1968 and at about $6 per share on April 20, 1972. Although Morris Ostroff testified that he purchased petitioner's stock because of petitioner's assurances that he thought it had bottomed out and represented *210 an excellent opportunity, neither Ostroff nor petitioner presented any evidence suggesting how anyone reasonably could have concluded at the time that it represented a turnaround situation. The losses incurred by AEI between 1967 and 1972 were severe and of an increasing nature. In two of those years it earned a combined total of $1.26 a share. Conversely, its combined losses before extraordinary items in the remaining four of those years were equivalent to $11.20 a share. We wonder why, if the growth outlook for AEI was so encouraging, would petitioner seek to sell his 172 shares to his good friend? Ostroff had a stockbroker and was accustomed to buying stocks and bonds through him for investment purposes. If the situation was so promising, why did not Ostroff purchase AEI through his broker and put the stock away as an investment as he had done on numerous other occasions?
By his own testimony Ostroff characterized himself as a conservative investor who usually purchased government bonds and utility stocks. He was most concerned with rating and yield, yet we are asked to believe that with reference to the instant transaction he abandoned his cautious investment habits and *211 purchased a speculative, non-dividend paying stock subject to wild market gyrations because he was interested in a "growth" situation. The "growth" had to be instantaneous because when, within 3 weeks of purchase AEI had not moved upward, Ostroff became disenchanted. Equally strange is that petitioner approached Ostroff under the circumstances and asked him to purchase the 172 shares. Ostroff believed that he was doing petitioner a favor by purchasing the AEI stock from him. If the accommodation to petitioner was anything other than a friend participating in the attempted establishment of an artificial tax loss, neither petitioner nor Ostroff offered any evidence to indicate what its nature might have been. Further doubt is cast upon the bona fide nature of the sale and repurchase by comparing the consideration passing between the parties on April 20, 1972, and May 23, 1972. Although Ostroff testified that he purchased at market value, $5.75 per share, AEI never traded as low as $5.75 on that date. Similarly, although petitioner repurchased from Ostroff for $5.75 a share May 23, 1972, the stock never traded that high on that date. The consequence of the transfers of checks *212 and stock certificates back and forth between the friends within the 33-day period was the attempted establishment of a $3,025.56 long-term capital loss without the slightest change in economic or financial position. While arm's-length dealings in the marketplace would have required different dollars to have passed for the purchase of 172 shares of AEI common stock on April 20 and May 23, 1972, between petitioner and Ostroff the economic and financial statusquo was preserved intact. Accordingly, we hold that the petitioner is not entitled to a long-term capital loss of $3,025.56 in 1972 resulting from the sale of 172 shares of AEI common stock. Decision will be entered for the respondent. Footnotes
1. Petitioner has not filed a brief. ↩
2. SEC. 1091. LOSS FROM WASH SALES OF STOCK OR SECURITIES. (a) Disallowance of Loss Deduction.--In the case of any loss claimed to have been sustained from any sale or other disposition of shares of stock or securities where it appears that, within a period beginning 30 days before the date of such sale or disposition and ending 30 days after such date, the taxpayer has acquired (by purchase or by an exchange on which the entire amount of gain or loss was recognized by law), or has entered into a contract or option so to acquire, substantially identical stock or securities, then no deduction for the loss shall be allowed under section 165(c)(2); nor shall such deduction be allowed a corporation under section 165(a)↩ unless it is a dealer in stocks or securities, and the loss is sustained in a transaction made in the ordinary course of its business.